LEE, et al, Respondents, v. COHRT, Appellant.

(232 N. W. 900.)

(File No. 6868. Opinion filed November 10, 1930.)

*H. G. Giddings,* of Mitchell, for Appellant.
*Loucks & Wolheter,* of Watertown, for Respondents.

BURCH, J.   Plaintiff brought this action to recover damages for breach of warranty in a contract for the sale of hogs.   The terms of the contract and of the warranty are in dispute.   Defendant claims that the contract was in writing, being evidenced by two letters; while plaintiff claims that in addition to the letters there was a telephone conversation embodying a part of the contract. Following are the facts deemed material to a decision of the issues in this court.   On the 24th of November plaintiff wrote a letter of inquiry addressed to defendant at Mitchell.   On the same day defendant replied as follows:

"Dear Sir:

"Replying to your inquiry about car pigs wish to say I would be glad to furnish them to you at 11.25 F. O. B. cars in the vicinity of Huron at 11.25 Certified weights and health certificate attached.

"Most of these pigs are average about 110 to the car but if you prefer them lighter will be glad to shape you up a load that way.   The heavier pigs run just a little better quality.

"We have had some cholera around but none to speak of now. I have shipped at least six to ten cars pigs a week for the past three months and have had but few complaints.   It would take me a few days to get your pigs after I hear from you.

"I was talking to Mr. Anderson last night and he said he was quite sure you would buy double and I will plan accordingly. I told him I could make shipment about Monday.   I understand

your feeding place is at Centerville which is on C. N. W., that is why I quote Huron. Can load elsewhere.

"Thanking you for the inquiry and you may try a load. I am,"

On the 26th plaintiff wrote to defendant:

"I am in receipt of your letter of the 24th in regards to a carload of shoats.

"You realize it is taking long chances on buying shoats now, there being so much hog cholera in the country. There was a carload recently shipped to a man not far from my farm, from Huron and I have learned he has lost a large number of them. Hope you can get us a car load from some place where they are not infected and you can doubtless get them from some other point besides Huron, so they can be shipped on the No. Western Ry. to Centerville, S. Dak. Try and buy me a good choice even carload not to weigh less than ninety pounds and up to one hundred ten and some could be one hundred fifteen pounds. It is too late in the season to buy light pigs. Ship me a double deck if possible if it requires a few days to buy them right it will be satisfactory to me to wait. The price you name 11.25 is also satisfactory. I would prefer not to have Hampshire either Poland China or Duroc. Bill to Lee & Erickson, Centerville, So. Dak. I understand there is a three-fourth rate within the state. Kindly advise if you can get these pigs for me."

Defendant claims the two letters above quoted constitute the contract. Plaintiff claims as a part of the contract that he had a telephone conversation with defendant at Mitchell concerning the purchase, in which defendant said he would guarantee healthy hogs. This telephone conversation is denied by defendant. After the receipt of the letters and the telephone conversation (if one was had), defendant purchased a carload of feeder pigs and consigned them to plaintiffs at Centerville. There is no dispute that the place of delivery of the pigs was f. o. b. at Watertown, the point from which defendant made the shipment. The pigs were purchased at Watertown and loaded there. On their arrival at Centerville, some of them appeared to be sick, but plaintiff unloaded them, paid the freight, and took them to his farm. When the pigs were loaded at Watertown, defendant sent plaintiff a telegram, dated December 1, 1926, stating: "Shipped your double pigs from

Watertown this morning Northwestern Railroad." On receipt of the pigs plaintiff wrote defendant a letter as follows:

"I am just in receipt of your bill for the carload of shoats containing 211 head 23150#. These shoats weight at Centerville 21335#, making a shrrinkage of 1815#. The shrinkage while heavy, is not the worst of it, these pigs are sick, the thirty white ones being worse than the others. These should not have been included in the lot as they must have plainly shown at the time of shipment that they were sick. Of course they will infect all the rest. One of the white ones died shortly after reaching the farm. We had the vet. come down from Centerville this morning to vaccinate them, but he advised not to do so as they were not in a fit condition to do so. My manager Mr. Erickson is doing everything he can to save them and are treating them for the flu. according to the vet. advice. Your draft has not yet been presented and thot best to advise you of the condition of the shoats before paying it. I think you had better notify the bank here to hold the draft a few days until we see how we are coming out. They are not a very choice lot of shoats but of this I would not complain if they had been otherwise. Those white ones had no right to be in the lot. This leaves a nine pound per head shrinkage which is excessive."

There was considerable correspondence between the parties following the receipt of the pigs. A large number died, and this action was brought to recover the loss occasioned thereby, together with special damages covering the amount paid for freight, veterinary bills, medicine and supplies, lost profits, time and expense in caring for the sick hogs, disposing of those that died, and damages for infected premises. The case was tried to a jury and a verdict rendered in favor of plaintiff for $1,637.83. From the judgment rendered thereon and an order denying a new trial, defendant appeals.

Appellant takes the position that the two letters composed the whole of a written contract; that therein is an express warranty covering the health of the hogs, whereby appellant agreed to furnish a health certificate with the bill of lading or shipper's contract; and that such express warranty precludes an implied warranty.

Respondents take the position that there was an express war-

ranty whereby defendant guaranteed the health of the hogs, and that whether there was an express warranty or not, that under the provisions of the Uniform Sales Act, chapter 355, Laws 1921, there was an implied warranty to insure the health of the hogs.

Appellant, to meet the contention of plaintiff that there is an implied warranty, contends that if such exists, it does not bind appellant to insure the health of the hogs, but only to due care in selecting them.

The learned trial court accepted respondents' view, and the case was tried on the theory that there was either an express or an implied warranty, or both, binding appellant to insure the health of the hogs. The court refused certain instructions requested by appellant to cover his theory and gave instructions covering respondents' theory which form the basis of assignments of error that will now be considered.

It is plain that if the two letters composed the entire contract, the express warranty therein covering the health of the hogs is that appellant will follow instructions of the buyer by avoiding infected districts and furnish a health certificate. If, on the other hand, the claimed telephone conversation forms a part of the contract and appellant therein agreed to furnish healthy hogs, it may be necessary to construe that agreement. Although the jury found in favor of respondents, it is not plain they found there was a telephone conversation. Their verdict is entirely consistent with the instructions without the telephone conversation. Whether the contract could be oral or partly oral under part 1, section 4, of the Uniform Sales Act (chapter 355, Laws 1921), need not be decided, for we are satisfied the court erred in instructing the jury.

Under the Uniform Sales Act, part 1, section 5, the contract, whether intended as a present sale or a contract to sell, must operate as a contract to sell, since the goods were at the time of making the contract to be acquired by the seller. To support their contention that there was an implied warranty, respondents rely on part 1, section 15, of the Uniform Sales Act, as follows:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any patricular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1)   Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2)   Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.

"(3)   If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed.

"(4)   *   *   *

"(5)   *   *   *

"(6)   An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith."

The court refused to instruct the jury as requested by appellant that:

"It is the theory and claim of the defendant that the whole contract between the parties with reference to the purchase and sale of the pigs in controversy so far as the dispute in this case arises, was contained in the two letters received in evidence as Exhibit 'B' and Exhibit 'One,' respectively, and you are instructed if you find from the evidence in the case that such two letters did in fact constitute the contract of purchase and sale between the parties, then the plaintiff cannot recover in this action and your verdict should be for the defendant."

■■   There is an express warranty in the letters concerning the health of the hogs, and that is that they shall be purchased with care to avoid possible infection and shipped with "health certificate attached."   There is no serious contention that appellant did not furnish the health certificate.   If there is any dispute on this matter, it pertains to the thoroughness of the examination, and the actual condition of the hogs at the time the shipment was made. There is some evidence, and respondents attempted to show, that the hogs on arrival were in such condition that they must have been at the time of delivery, f. o. b. at Watertown, visibly sick.

If they were, there was a breach of the express warranty. Knowingly or negligently furnishing a false certificate would not be a compliance with the agreement. The requested instruction was not correct in advising the jury that respondents could not recover, if the jury found the two letters constituted the contract, because it was not qualified so as to permit a recovery if the jury found the hogs were visibly sick when delivered in the car at Watertown.

The learned trial judge, though not in error in refusing the instruction in the form requested, erred in his instructions. He gave no instruction of similar import properly qualified to meet other issues, but seems to have been of the view that respondents might recover on either an express warranty or an implied warranty existing at the same time. That it was not very material whether the express warranty was all that was claimed by respondent, because if the express warranty fell short there was an implied warranty to furnish healthy hogs, and that such implied warranty bound appellant to insure their health though he might not know or have any means of knowing that they were infected. The following quotation from the instructions shows the view of the trial court:

"plaintiffs bring this action to recover damages for their losses upon two grounds.

"First: Because they claim that in the negotiations for the purchase of these pigs the defendant promised and agreed that the pigs furnished would be healthy pigs. This is known in law as 'an express warranty.'

"Second. Because they claim that they relied upon the skill and judgment of the defendant and informed him that they were purchasing the pigs for keeping, feeding and preparing for market and that the defendant, by undertaking to furnish the pigs, impliedly agreed to furnish pigs reasonably suitable for such purposes and this is known in law as 'an implied warranty.'

"The law that where a buyer expressly or by implication makes known to the seller the particular purpose for which an animal is required and it appears that the buyer relies on the seller's skill or judgment, there is an implied warranty that the animal shall be reasonably fit for such purpose. Now, in order for the plaintiffs to recover, they must establish one or the other of these warranties by a fair preponderance of the evidence. If

the evidence fails to show by a fair preponderance of it that the defendant promised or agreed to furnish the plaintiffs with healthy pigs and also fails to show by a fair preponderance of it that the plaintiffs relied upon the skill and judgment of the defendant, and fails to show that he was informed of the purpose for which the pigs were being purchased, you should go no further with the case, but find a verdict for the defendant for six hundred fifty-eight dollars. This being the balance of the unpaid purchase price with interest from December 4th, 1926. The reason for this is that a seller of live stock is not liable to the purchaser for any losses which he may sustain by reason of sickness or disease of the animal unless he has warranted them to be healthy either expressly by agreement or impliedly that the pigs were healthy before the purchaser can recover for losses for sickness or disease. On the other hand, if the evidence does show by a fair preponderance of it that during the negotiations for the purchase of the pigs, the defendant agreed or promised to furnish healthy pigs or if it shows by a fair preponderance of it that the plaintiffs relied upon the skill and judgment of the defendant and that the defendant was informed that the pigs were being purchased for keeping, feeding and preparing for market, you will then proceed to determine whether any of the pigs shipped to the plaintiffs were at the time they were loaded in the car at Watertown, afflicted with any disease which caused their death or the death of others by reason of infection or contagion directly or indirectly from them.

"Now, when is an animal to be considered as afflicted with a disease. This is sometimes a very difficult question. The best rule of law that I can think to give you is that an animal should be considered as diseased when the germs of a disease have been implanted in and so far taken hold of the system of the animal that unless arrested by some artificial means, would under normal conditions so develop that death or permanent injury to the animal will probably result. That is a question for the jury to determine. You will simply have to take the evidence and apply to it your judgment and experience as men and determine it the best way you can and the way you think it should be determined upon the evidence and the law upon this question."

As thus instructed, it not being denied that appellant knew the purpose for which the hogs were bought, if the jury found

the pigs were infected when loaded a verdict for respondents must logically follow. Any other facts left to their determination were of little or no importance. There is no way of knowing from the verdict whether appellant was held upon an express warranty contained in the letters, or upon an express warranty contained in the letters supplemented by a telephone conversation, or upon an implied warranty arising from the fact that the buyers made known to him the purpose for which they were buying the hogs and it appeared that they relied on his skill and judgment in furnishing hogs reasonably fit for the purpose. The health of the hogs was a matter with reference to which the parties might contract, and being a matter of serious concern was mentioned and considered in their negotiations. Both parties insist that there was an express warranty. Therefore no implied warranty is involved. Dewitt v. Berry, 134 U. S. 306, 10 S. Ct. 536, 33 L. Ed. 896; Lombard Water-Wheel Governor Co. v. Great Northern Paper Co., 101 Me. 114, 63 A. 555, 6. L. R. A. (N. S.) 180; Smith v. McCall, 1 McCord (S. C.) 220, 10 Am. Dec. 666; Wasatch Orchard Co. v. Morgan Canning Co., 32 Utah, 229, 89 P. 1009, 12 L. R. A. (N. S.) 540; Notes in 102 Am. St. Rep. 609, 22 L. R. A. 187 and 33 L. R. A. (N. S.) 503.

Respondents, however, contend that in all cases under the Uniform Sales Act "where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the sellers, skill or judgment, * * * there is an implied warranty that the goods shall be reasonably fit for such purpose," and that this implied warranty is not negatived by an express warranty unless inconsistent therewith. We think two warranties purporting to cover the same subject are bound to be inconsistent unless of the same legal effect. The Uniform Sales Act is not in conflict with the rule announced by the weight of authority prior to its adoption. It simply attempts to make the law uniform in states adopting the act and abolishes the minority rule prevailing in some states excluding all implied warranties where there is a written contract, or where there is an express warranty concerning any subject, though not the one involved. It is not intended to prevent or limit the right to contract or permit contradiction of a written or express contract. So called implied warranties are injected into the

law of contract to hold vendors to a course of fair dealing. In Hoe v. Sanborn, 21 N. Y. 552, 78 Am. Dec. 163-173, the court said:

"Implied warranties do not rest upon any supposed agreement in fact. They are obligations which the law raises upon principles foreign to the actual contract; principles which are strictly analogous to those upon which vendors are held liable for fraud. It is for the sake of convenience, merely, that this obligation is permitted to be enforced under the form of a contract. However refined this distinction may appear, its nonobservance has led to much of the confusion to be found in the cases on this subject."

Ruling Case Law, vol. 24, p. 187, § 459, treats the subject "Fitness for Intended Purpose" as applied to implied warranties and says the general rule there declared is carried in effect into the English Sale of Goods Act, section 14. This English act is substantially the same as section 15, part 1, of our Uniform Sales Act relied on by respondents. The principles declared to have been carried into the Sales Acts may be summarized as follows: In the absence of an express warranty, where the buyer selects a particular defined and ascertained article, he relies upon his own judgment and takes upon himself the risk of its answering his purpose. The maxim caveat emptor applies, but where the buyer does not designate any specific article, but orders goods of a particular quality, or for a particular purpose, and that purpose is known to the seller, the presumption is the buyer relies upon the judgment of the seller, and the seller by undertaking to furnish the goods impliedly undertakes they shall be reasonably fit for the use intended.

The application of these general principles must necessarily depend upon the circumstances and facts of each case. In the case at bar respondents wrote: "You realize it is taking long chances on buying shoats now, there being so much hog cholera in the country." This indicates the buyer expected to take the chance and relied upon defendant to select pigs that were free from cholera. Respondents express a hope that appellant can get hogs not infected and that he can get them at some point other than Huron, where they will be less likely to be infected. Such specific directions may require appellant to use care in buying, and to avoid buying in infected neighborhoods, but they do not indicate

that appellant was required or expected to do more than that. The record does not disclose that appellant possessed any skill or judgment in determining the health of a hog not visibly sick, or that respondents thought he possessed such skill or judgment or relied upon or had a right to rely upon appellant's skill or judgment in that matter. On the contrary, it is plain from the correspondence that nothing of the kind was expected. We think appellant was bound to use care in buying and to buy according to instructions, and that there was an express warranty to do so and furnish a health certificate. No implied warranty is involved in this case.

The judgment and order appealed from are reversed.

POLLEY, SHERWOOD, and CAMPBELL, JJ., concur.

BROWN, P. J., dissents.